577 F.2d 1247
 UNITED STATES of America, Plaintiff-Appellee,
v.
Mike CLEMONES, Priscilla Scott, Charles Everett Coburn, Jr.,
Joseph Harold Johnson, and William Alonzo Johnson,
Jr., Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellant,
v.
Edward Raymond LeCOMPTE and Kathy Hatmaker, Defendants-Appellees.
 Nos. 76-3866, 76-3870.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 9, 1978.
As Modified on Denial of Rehearing and Rehearing En Banc Nov. 6, 1978.
 
 Robert K. Finnell, Rome, Ga., (Court-appointed), for Clemones.
 Harold N. Wollstein, Rome, Ga., (Court-appointed) for Scott and Joseph Harold Johnson.
 John E. Sawhill, III, Rome, Ga., (Court-appointed), for Coburn.
 W. Benjamin Ballenger, Summerville, Ga., for William A. Johnson, Jr.
 William L. Harper, U. S. Atty., James E. Baker, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee in No. 76-3866.
 John W. Stokes, U. S. Atty., James E. Baker, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellant in No. 76-3870.
 Bobby Lee Cook, Summerville, Ga., for LeCompte.
 A. Cecil Palmour, Summerville, Ga., Robert W. Ritchie, Knoxville, Tenn., for Hatmaker.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before JONES, GODBOLD and GEE, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 In a three weeks jury trial the individual appellants were convicted of substantive or conspiracy counts, or both, arising from multi-state prostitution activities conducted at many locations in the South and Southeast.[1] The convictions of all appellants are affirmed. The United States also appeals, from judgments of acquittal entered by the trial court as to two defendants after they were found guilty by the jury. We reverse the judgments of acquittal.
 
 
 2
 The evidence displayed organized prostitution in its most degrading aspects. The women ranged from experienced professionals to teen-age girls as young as 14, some induced into prostitution by promises of money, clothing and cars, others forced by beatings and threats of violence, even some recruited through their parents. They worked with and often were controlled by pimps to whom they turned over their earnings, and when necessary they were disciplined by threats, beatings and pistol whippings.
 
 
 3
 By plane, bus and the cars of pimps the women were moved from location to location on command, from Virginia to Alabama, to cities, towns and rural truck stops, where they operated in houses of prostitution, apartments, massage parlors, mobile homes and the outbuildings of rural service stations. Some were "owned" by one pimp, others by "joint owners." Women were "sold" by one pimp to another.[2] Arrangements were made for abortions, releases on bail and even dental care. The take was large, for example $110,000 in five to six months at a small-town Georgia truck stop. Prostitutes earned as much as $400-$500 per week; as little as clothing money.
 
 I. Denial of access to witnesses
 
 4
 The assistant United States Attorney handling the case instructed some 30 to 35 witnesses appearing before the grand jury that the proceedings were secret and that they should not discuss their testimony with anyone other than their attorneys or government agents. The defense learned of this and filed a motion asking to be permitted to talk to the witnesses. A magistrate heard the motion and, on March 26, 1976, entered an order stating that the witnesses could talk with defense counsel. He ordered that each witness subpoenaed by the government be served forthwith with a copy of the order.
 
 
 5
 The case was set for trial April 5. The government asserts that on April 5 a copy of the order was given to all, or most, of the witnesses. The defendants say this was not done until July 12. The case was continued to June 7, and before that date continued again to July 12. On July 12 the court learned that defendants still had not had full access to the witnesses who had appeared before the grand jury. In some instances defense counsel had been able to talk to, and even get a statement from, a witness. The government does not dispute, however, that in the main the witnesses had not been interviewed by the defense. It is unclear whether this was caused by lack of knowledge of the magistrate's order, failure of the government to serve the order, dilatoriness of the defendants, or some combination of these factors. For purposes of this appeal, we assume the fault was the government's.
 
 
 6
 The district judge tried to rectify the matter. The witnesses were assembled in the courtroom with government counsel excluded and advised of their rights and obligations as witnesses. Defense counsel began interviewing persons willing to submit to interviews. There were approximately 12 defense counsel present, and about 10 of some 80 witnesses were interviewed on July 12. As this process began either the magistrate or the assistant United States Attorney told some of the witnesses not yet interviewed that they were excused until the next day. Before the actual trial began the following day the defendants moved for a continuance based on their inability to prepare. The motion was denied. The trial began and lasted three weeks.
 
 
 7
 All defendants contend these events deprived them of a fair trial. The government has conceded, grudgingly and half-heartedly, that the instructions to the witnesses were improper.[3] It has not satisfactorily explained the failure to serve the magistrate's order forthwith on as many witnesses as could be found. The government erred, but other than general allegations of prejudice the defendants have not shown that they were really harmed by belated access to the witnesses. The names of some witnesses were revealed by the indictments. By July 12 some of the defendants had already talked to, and even obtained statements from, some witnesses. Several days before trial the government furnished statements of witnesses, FBI reports of interviews and grand jury testimony. On the first day of trial the government furnished defendants a list of government witnesses. No particularized prejudice is even argued with respect to any specific witnesses. Defendants made no showing that they could not interview witnesses as the long trial progressed. When the government rested after two weeks and 47 witnesses, no defendant asked for additional time to further prepare a defense or to locate additional witnesses.
 
 
 8
 Defense counsel were indignant at the government's interference with their access to witnesses and its inept response to corrective efforts, and they were entitled to be indignant. But they have not demonstrated real, substantive impairment of their right to fair trial.
 
 II. Other prosecutorial misconduct
 
 9
 On cross-examination it was brought out that government witness Lawrence had given a statement to an investigator for some of the defendants in which he described instructions that he said were given him by the assistant United States Attorney concerning how he should conduct himself when called as a witness. The general effect of the alleged instructions was that when defense objections had been sustained to testimony, upon a signal from the assistant United States Attorney witness Lawrence would get the information over to the jury anyhow. If the alleged instructions were given, it is not shown that any prejudice to defendants resulted. The same analysis applies to the testimony of a hostile government witness, who stated that when she questioned what she said were inaccuracies in a statement previously taken from her by the FBI, the assistant United States Attorney threatened her with a perjury charge "if (she) got on the stand and lied."III. Discovery
 
 
 10
 Before trial the government turned over to defendants a great volume of Jencks Act material. Defendants complain of the failure to turn over one FBI interview report, failure to tell the defense that a witness had told an FBI agent of some insignificant errors in the transcript of his grand jury testimony, and failure to tell defendants that in the past a government witness had been a paid informer. These complaints are overblown and in no instance shown to be prejudicial.
 
 
 11
 Also, the government was required to give the names of persons who had been promised immunity. It delayed in doing so despite several demands. Only a limited number of persons the government says three had been extended formal immunity. Nevertheless, the prosecutor realized that statements had been made informally to witnesses, particularly young prostitutes, that they were not going to be prosecuted for prostitution, and he furnished at trial a list of 30 names. The government's response was dilatory, but no defendant points out any prejudice.
 
 IV. Single versus multiple conspiracies
 
 12
 Some of the defendants raise the Kotteakos[4] contention that a single conspiracy was charged, multiple conspiracies proved. The conspiracy here is similar to that in U. S. v. Perez, 489 F.2d 51 (CA5, 1973). We eschew any effort to describe it in structural terms. It was a single-purpose and continuously ongoing undertaking to operate a multi-state prostitution enterprise. Prostitutes were recruited, "broken in," cared for, disciplined, moved from location to location, and dropped out of the ring or were put out. Many reappeared and rejoined. The nature of the enterprise necessarily included a cast part permanent and part changeable and changing, and constantly changing locations. Billy Johnson was the dominant force. Clemones, Dill, Surrett, Joseph Earl Johnson, and others were helpers, associated pimps and junior pimps, some not always present but floating in and out of the ongoing operation. We hold that there was no variance, but if there was the substantial rights of the defendants were not materially affected.
 
 V. Defendant Scott
 
 13
 Scott was not entitled to judgment of acquittal on count 10. Count 10 charged her with a violation of the Mann Act by aiding and abetting in the transportation of Thelma Ann Lunsford from Georgia to Johnson City, Tennessee, in 1973. Lunsford had been working in various cities for Billy Johnson. Johnson, in Rome, Georgia, told her that he was sending her to Johnson City, Tennessee. In Lunsford's presence Johnson called Scott, who operated a house of prostitution in Johnson City, and told Scott that he was sending Lunsford to Johnson City. Johnson took Lunsford to Chattanooga, Tennessee, where she caught a bus to Johnson City. She was met there at the bus station by Scott who took her to Scott's emporium. Lunsford worked there as a prostitute for two weeks, then on instruction from Johnson returned by bus to Chattanooga. Johnson met her there and drove her back to Rome. Lunsford gave Johnson money she had earned working for Scott. Later Lunsford traveled to Johnson City several more times, went to Scott's, and worked there as a prostitute.
 
 
 14
 Scott contends that on Lunsford's first trip in 1973 the only act she committed was to meet Lunsford at the bus station in Johnson City at which time the offense already had been completed. This overlooks the prearrangement consisting of the telephone call, followed by the actual interstate transportation with the last leg terminating at Scott's house in Johnson City. U. S. v. Dimsdale, 410 F.2d 358 (CA5, 1969), holds that the transportation necessary for conviction is complete when the state line is crossed. It does not stand for the converse, i. e., that furnishing transportation after the state line is crossed and as part of a prearranged interstate trip is not an offense. See Cwach v. U. S., 212 F.2d 520 (CA8, 1954).
 
 
 15
 Scott received a three-year sentence on each count, all concurrent. Under the concurrent sentence doctrine, we need not consider the validity of Scott's convictions on counts 1, 2 and 25.
 
 VI. Defendant Joseph Harold Johnson
 
 16
 By arrangement between this defendant and Billy Johnson, Lunsford went from Georgia to Florida to entertain "the Colonel," a man with whom this defendant was attempting to negotiate a land transaction. The defendant and Clemones drove Lunsford to this defendant's motel in Florida, where she met "the Colonel" and had sexual relations with him. He paid no money to her for her favors, and as far as she knew he paid no money to anyone.
 
 
 17
 Defendant was convicted under 18 U.S.C. § 1952, making it unlawful to travel in interstate commerce with intent to carry on an unlawful activity and thereafter to perform an act to carry on said activity. The term " unlawful activity" includes any business enterprises involving prostitution offenses in violation of the laws of the state where committed. 18 U.S.C. § 1952(b). The appellant says that under Florida law prostitution is confined to sexual intercourse for hire. But Fla.Stat.Ann. § 796.07 (West 1976) also includes in the definition "giving or receiving of the body for licentious sexual intercourse without hire." Appellant also argues that the isolated event with "the Colonel" does not amount to a business enterprise within § 1952. The jury could have concluded, however, that the defendant's motel was a business enterprise involving prostitution and that the trip to Florida was intended in part to facilitate the carrying on of unlawful activity in the motel.
 
 VII. Defendant Clemones
 
 18
 Clemones asserts that he was entitled to judgment of acquittal on the conspiracy count and on substantive counts 2, 16, 17, 18 and 25. His argument, in essence, is that the evidence of his furnishing or otherwise participating in the transportation of prostitutes to points in other states shows no more than that "he went along for the ride" with defendant Billy Johnson. Billy Johnson was the master pimp of the network. Clemones was deeply involved with Johnson and the network in many ways that were described to the jury. The jury could infer that Clemones, who was active on numerous other occasions in various ways including transporting prostitutes to other states was not an innocent guest on these delivery runs but was a central figure in the conspiracy.
 
 
 19
 Because Clemones' sentences under counts 2, 16, 17, 18 and 25 are concurrent with his sentence under the conspiracy count, we need not consider his remaining arguments.
 
 VIII. Defendant Coburn
 
 20
 Coburn was convicted on counts 1 and 41. He received concurrent sentences.
 
 
 21
 A pimp named Surrett, with whom Billy Johnson had many dealings, testified that Johnson asked him to go into partnership with Johnson and Coburn for conducting prostitution at Coburn's truck stop in Cedar Bluff, Alabama. Johnson brought a young girl from his trailer at Rome, Georgia, to Coburn's place, talked with Coburn and left. The girl declined to engage in prostitution. Johnson returned and beat her, and she then did engage in prostitution, with Coburn and his wife arranging her dates. After a couple of days of this Coburn drove the girl to Rome and delivered her back to Johnson.[5] The jury found that Coburn was a member of the conspiracy, and we will not disturb this finding. Coburn also attacks the alleged failure of the government to promptly furnish a list of its witnesses. The list was furnished on the first day of trial. In view of the concurrent sentence, we need not discuss Coburn's conviction on Count 41.
 
 IX. The government's appeal
 
 22
 The jury found Hatmaker and LeCompte guilty on Count One. The trial court, however, found the evidence insufficient to support verdicts against Hatmaker and LeCompte and granted their motions for judgments of acquittal. From these rulings the government appeals. We reverse.
 
 
 23
 The government can appeal a judgment of acquittal entered after a verdict of guilt. In U. S. v. Boyd, 566 F.2d 929 (CA5, 1978), this court held such an appeal permissible pursuant to 18 U.S.C. § 3731 (1976). The decision in Boyd is not inconsistent with the principles announced in U. S. v. Martin Linen Supply Co., 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). See U. S. v. Scott, --- U.S. ----, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978).
 
 
 24
 We must decide whether the evidence, viewed in the light most favorable to the government, was sufficient to support the jury's conclusions that beyond reasonable doubt the appellees conspired to violate § 1962(c).
 
 
 25
 Under Count One Hatmaker and LeCompte were charged with a conspiracy to operate an interstate prostitution ring through a pattern of racketeering activity. Our affirmance of the convictions of Billy Johnson, Clemones, Charles Coburn, and Scott establishes that the government proved the existence of the conspiracy. The government was not required to prove that the appellees had full knowledge of all the details of the conspiracy. Knowledge of its essential nature to operate a prostitution ring through a pattern of racketeering activity is sufficient. U. S. v. Brasseaux, 509 F.2d 157, 160 (CA5, 1975). See Blumenthal v. U. S., 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154, 168 (1947). In this case the evidence is sufficient that each appellee harbored the required intent to enter the conspiracy as well as the state of mind necessary to commit the object offense of conducting the affairs of an enterprise through a pattern of racketeering activity. Compare U. S. v. Cantu, 557 F.2d 1173 (CA5, 1977), cert. denied, 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978), with U. S. v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). See Marcus, Criminal Conspiracy: The State of Mind Crime Intent, Proving Intent, and Anti-federal Intent, 1976 U.Ill.L.F. 627.
 
 
 26
 The evidence, as it relates to Hatmaker, shows that she operated a house of prostitution in Knoxville, Tennessee. In 1971 Billy Johnson called her from Rome, Georgia, and told her that he would bring Thelma Lunsford to Hatmaker's place in Knoxville for prostitution. He then brought Thelma to Hatmaker's house, and she did engage in prostitution there and turned her earnings over to Billy Johnson. In 1973 or 1974, Mildred Lunsford traveled with Billy Johnson and Thelma Lunsford from Rome, Georgia, to Chattanooga, then Mildred traveled by common carrier to Johnson City, Tennessee, where Hatmaker met her. Thereafter Mildred worked in Johnson City as a prostitute. On a second occasion, Hatmaker met Mildred on her arrival in Johnson City. Again, Lunsford worked as a prostitute in Johnson City. The evidence further reveals that Linda Bishop, a prostitute, worked at Hatmaker's establishment in Knoxville after traveling to Knoxville with Thelma Lunsford. She gave Hatmaker some of her earnings while there. Bishop left Knoxville and flew to Atlanta to meet Billy Johnson.
 
 
 27
 The evidence, as it relates to LeCompte, shows that he managed the Big Rig Truck Stop near Newport, Tennessee, and that the truck stop was one of the locations at which Billy Johnson placed his prostitutes. Thelma Lunsford was brought there by Billy Johnson. LeCompte was running the Big Rig, and Thelma gave him half the money she made. She overheard conversations between LeCompte and Billy Johnson regarding prostitution. When LeCompte was arrested, records were found in the cabin next to his residence which the jury could infer showed Thelma's daily earnings. Linda Bishop was brought to the Big Rig by Billy Johnson to engage in prostitution, and while there she gave part of her money to LeCompte. Catherine Weathers was brought by Billy Johnson from Roanoke, Virginia, to the Big Rig and introduced to LeCompte.
 
 
 28
 Thus, prostitutes were brought from out of state and delivered, or were sent from out of state and were met, and were set up in business at Hatmaker's and at the Big Rig. Some or all of them paid over earnings to Hatmaker or LeCompte and to Billy Johnson. Johnson, the pimp, discussed travel arrangements with Hatmaker. He talked prostitution with LeCompte and introduced Weathers to LeCompte. These things occurred in the conduct of prostitution, in which movement of women from place to place, and supervision of women by pimps, and division of money with the pimp and the operator, are characteristic. With respect to both Hatmaker and LeCompte the jury could infer that each knew that the essential nature of the conspiracy embraced a pattern of travel in interstate commerce by persons intending to advance their unlawful business enterprise through the commission of acts specified in 18 U.S.C. § 1961 and embraced the division of the earnings of the prostitutes who had been sent or brought in. The jury was entitled to reject inferences that Hatmaker and LeCompte each carried on a local enterprise and had no knowledge that the conspiracy into which they entered as participants involved interstate travel. The trial court erred in granting the motions for judgments of acquittal by Hatmaker and LeCompte.
 
 
 29
 The judgments of conviction of the individual appellants are AFFIRMED. The judgment acquitting Hatmaker and LeCompte on Count One is REVERSED and the case REMANDED for proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Of the defendants involved in this appeal, all except Joseph Harold Johnson were convicted on Count One of the 44-count indictment. Count One charged each defendant with conspiring to operate an interstate prostitution ring through a pattern of racketeering activities in violation of 18 U.S.C. § 1962(d) (1976). Billy Johnson, Priscilla Scott and Mike Clemones were convicted on Count Two, which charged them with operating an interstate prostitution ring through a pattern of racketeering activities in violation of 18 U.S.C. § 1962(c) (1976). Charles Coburn was convicted on Count Forty-one, which charged a violation of 18 U.S.C. § 2421 (1976). Joseph Harold Johnson was convicted on Count Eighteen, which charged a violation of 18 U.S.C. § 1952(a) (1976). Additionally, Scott was convicted on two other counts, Clemones on four, and Billy Johnson on 19. Each of these counts charged a violation of 18 U.S.C. § 1952(a) (1976), 18 U.S.C. § 2421 (1976), or 18 U.S.C. § 2422 (1976)
 The relevant portions of the statutes, all from 18 U.S.C., are set forth below.
 § 1961. Definitions
 As used in this chapter
 (1) "Racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2421-24 (relating to white slave traffic), . . .
 § 1962. Prohibited activities
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity of the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.
 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 Added Pub.L. 91-452, Title IX, § 901(a), Oct. 15, 1970, 84 Stat. 942.
 § 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to FC (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
 and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
 § 2421. Transportation generally
 Whoever knowingly transports in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or
 Whoever knowingly procures or obtains any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce, or in the District of Columbia or any Territory or Possession of the United States, in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery, or any other immoral practice, whereby any such woman or girl shall be transported in interstate or foreign commerce, or in the District of Columbia or any Territory or Possession of the United States
 Shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 June 25, 1948, c. 645, 62 Stat. 812; May 24, 1949, c. 139, § 47, 63 Stat. 96.
 § 2422. Coercion or enticement of female
 Whoever knowingly persuades, induces, entices, or coerces any woman or girl to go from one place to another in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose on the part of such person that such woman or girl shall engage in the practice of prostitution or debauchery, or any other immoral practice, whether with or without her consent, and thereby knowingly causes such woman or girl to go and to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 June 25, 1948, c. 645, 62 Stat. 812.
 
 
 [2]
 One young girl, not previously a prostitute, was "delivered" by Billy Johnson to an Alabama truck stop to be a waitress. She refused to engage in prostitution, Johnson came back and beat her, and she acceded. The operator, Cleburn, returned her to Johnson after a few days and Johnson then "sold" her to another pimp for $500
 
 
 [3]
 See, e. g., U. S. v. White, 454 F.2d 435 (CA7, 1971), cert. denied, 406 U.S. 962, 92 S.Ct. 2070, 32 L.Ed.2d 350 (1972); Gregory v. U. S., 125 U.S.App.D.C. 140, 369 F.2d 185 (1966), aff'd after remand, 133 U.S.App.D.C. 317, 410 F.2d 1016, cert. denied, 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969)
 The government represents that the assistant United States Attorney gave the erroneous instructions to the witnesses under what he thought was an office policy, and that he was motivated by protecting the witnesses, many of whom were young and frightened prostitutes, from publicity, threats and even violence. But denial of defense access to the witnesses, imposed on the prosecutor's ex parte order, was not the proper way to pursue these objectives.
 
 
 [4]
 Katteakos v. U. S., 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)
 
 
 [5]
 This was the girl "sold" to another pimp for $500