UNITED STATES of America

v.

Tyrone COLEMAN.

Crim. No. 78–597–M.

United States District Court, E. D. Pennsylvania.

July 27, 1979.

Curtis E. A. Karnow, Asst. U. S. Atty., Philadelphia, Pa., for the U. S.

Alan A. Turner, Public Defender, Philadelphia, Pa., for defendant.

POLLAK, District Judge.

Tyrone Coleman was tried before Magistrate Powers and found guilty of violating 18 U.S.C. § 113(d)[1] which prohibits "striking, beating, or wounding" another "within the . . . territorial jurisdiction of the United States." Mr. Coleman now appeals from that conviction.[2]

On July 16, 1978, at approximately 2:30 A.M., appellant Coleman, who had been drinking, cut his hand on a glass panel near the entrance to the United States Post Office at 30th and Chestnut Streets, Philadelphia. Seeking medical attention, appellant entered the Post Office, where he received first aid from Sergeant Edward W. Smith of the Post Office Security Force. At first Mr. Coleman asked to be taken to the Veterans Hospital for further care; but after some discussion (punctuated by threats to sue the Post Office), he elected to drive his own vehicle to the hospital. Security Officer Charles L. Ebner was assigned to follow Mr. Coleman to the hospital and to report back on his condition.

Appellant and Officer Ebner never reached their destination. Appellant stopped his car at a light on Chestnut Street, near the Post Office, and refused to move on when the light turned green, thereby creating an obstacle for traffic. Officer Ebner immediately radioed for assistance; he then left his car and approached Mr. Coleman's car, urging Mr. Coleman to proceed to the hospital. Appellant made no response but drove through the intersection and parked by the curb.

Mr. Coleman left his car and walked toward Officer Ebner, who by this time had been joined by Officer Robert Joseph Wood. A confrontation ensued in which Mr. Coleman, fist raised, cursed the officers and threatened violence. Still shouting obscenities, appellant walked toward the Post Office, apparently to speak with the two officers' supervisor. At the door to the Post Office, appellant was met by Sergeant Smith, who had previously given him first aid; Smith calmed appellant and persuaded him to go to the hospital in a Government car. Appellant then entered a Government car and, with Officer Ebner, waited for another security officer to accompany him to the hospital.

After a five-minute wait, Mr. Coleman got out of the Government car, announcing his intention to drive himself to the hospital. Officer Ebner radioed for instructions and was told to arrest Mr. Coleman. He did just that: he stopped appellant in the street, grabbed him by the arm, and led him to the Post Office. In the revolving door of the Post Office, appellant kicked Ebner in the shin—the assault for which he stands convicted.[3]

Critical to this appeal is the fact that appellant was stopped on a public street outside the jurisdiction of the United States and then brought back onto federal property where the assault occurred.[4]

## II.

### A.

■ Appellant Coleman's argument, most broadly stated, is that he was not voluntarily on federal property at the time he committed the assault and that a volun-

1. That section provides:

   Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:

   (d) Assault by striking, beating, or wounding, by fine of not more than $500 or imprisonment for not more than six months, or both.

2. Rule 8 of the Rules of Procedure for the Trial of Minor Offenses before the United States Magistrates provides that a conviction can be appealed to a judge of the District Court. And,

under that rule, the scope of this Court's review is the same as if the case were before the Court of Appeals on appeal from the District Court.

3. Later, inside the Post Office, Officer Ebner, in the course of restraining appellant, slipped and cut his hand on a glass fuse box.

4. A metal strip in the sidewalk surrounding the Post Office marks the boundary of federal property.

tary presence is an essential element of the crime for which he stands convicted. In support of this position, Mr. Coleman relies on *Martin v. State*, 31 Ala.App. 334, 17 So.2d 427 (App.Div.1944) and *People v. Newton*, 72 Misc.2d 646, 340 N.Y.S.2d 77 (Sup.Ct.1973).

In *Martin*, the defendant was drinking in his home when police officers seized him, took him onto a public highway, and then arrested him there under an Alabama statute punishing "[a]ny person who intoxicated or drunk . . . appears in any public place . . . and manifests a drunken condition." Martin's conviction was reversed by the Alabama Court of Appeals because his presence on the public highway was involuntary: "[u]nder the plain terms of the statute, a voluntary appearance is supposed." In *Newton*, the defendant, concealing a loaded revolver on his person, boarded an airplane bound from the Bahamas to Luxembourg. Although no stops in the United States were scheduled, the plane put down in New York, and defendant was arrested on board for possession of a loaded firearm in violation of New York law. The New York Court granted *habeas corpus*, finding that his involuntary presence precluded criminal liability.[5]

These decisions—properly decided as they very likely were—are not, however, compelling authority for the conclusion that Section 113 of Title 18 requires voluntary presence on federal property. Here, unlike *Martin* and *Newton*, involuntary presence was not the final ingredient without which criminal liability would not have attached. Rather, appellant was convicted for his voluntary conduct once he was within the territorial jurisdiction of the United States—that voluntary conduct being his assault on Officer Ebner. The assault itself constitutes the necessary voluntary act: the requirement is not that every aspect of wrongful behavior be volitional, but that liability be "based on conduct which includes a voluntary act." Model Penal Code § 3.01(1).

Appellant argues that voluntary presence is required because Section 113 "was designed . . . to deter those who would come upon Federal property to commit an assault." But there is nothing to suggest that Congress' purpose was so limited. Congress, it appears, sought to insure that all assaults committed on federal property could be prosecuted in a federal forum, thereby guaranteeing uniform and vigorous protection of federal interests.[6] Indeed, as the Government notes, appellant's restrictive interpretation would render Section 113 inapplicable to assaults committed by persons imprisoned in federal institutions. The cases applying Section 113 in such circumstances are legion,[7] and it is hard to conceive that Congress intended otherwise.

### B.

■ Less sweepingly, Mr. Coleman argues that a conviction cannot be sustained

---

5. See also *Larsonneur*, 24 Cr.App. 74, 149 L.T.R. 542 (1933). There, a French woman was arrested in the Irish Free State, brought to England, and turned over to the British police who charged her with the offense of being an alien "found" in the United Kingdom without permission of the government—a crime for which she was convicted. The comments to the Model Penal Code criticize that result. Comments § 2.01.

6. Cf. *United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). In *Feola*, the Court held that knowledge that one's intended victim is a federal officer is not a requisite for a conviction under 18 U.S.C. § 111. In interpreting Section 111, the Court relied heavily on a 1934 letter from Attorney General Homer Cummings urging passage of the legislation because "[t]he Federal Government should not be compelled to rely upon the courts of the States, however respectable and well disposed, for the protection of its investigative and law enforcement personnel." The legislative history of Section 113 also evinces a Congressional choice not to entrust to the States the sole responsibility for the interdiction of assaults. In 1940, for example, the assault provision (then 18 U.S.C. § 455 and 18 U.S.C. § 7) was expanded to extend federal criminal jurisdiction to property over which the United States exercised concurrent territorial jurisdiction. Then Attorney General (later Justice) Frank Murphy endorsed the extension as necessary "to enhance the effectiveness of the administration of the federal law."

7. E. g., *United States v. Stolarz*, 550 F.2d 488 (9th Cir. 1977); *United States v. Cunningham*, 166 U.S.App.D.C. 206, 509 F.2d 961 (1975); *United States v. Patmore*, 475 F.2d 752 (10th

under Section 113 where a defendant's "presence [is] the result of compulsion attendant to an unlawful arrest." This argument, although couched in the language of the voluntary act requirement, seems more nearly an assertion that appellant was entitled to use force to resist an illegal arrest.

Even assuming *arguendo* that the arrest in this case was illegal,[8] the argument that forceful resistance was permissible must be rejected. This is not a case in which an arrest was effected in bad faith either to provoke a citizen into criminal conduct or to deter him from exercising his constitutional rights. Compare the cases discussed in Chevigny, *The Right to Resist an Unlawful Arrest*, 78 *Yale L.J.* 1128, 1138–50 (1969). Here, appellant Coleman was detained because his conduct posed an appreciable danger to himself and to others. On these facts, I am in agreement with Judge Powers, whose opinion canvasses the developing case law, that "the defendant had no right to use force to resist the arrest."

### Conclusion

Accordingly, appellant's conviction is affirmed.

Cir. 1973); *Hockenberry v. United States*, 422 F.2d 171 (9th Cir. 1970); *United States v. Walker*, 393 F.2d 491 (4th Cir. 1968).

8. For a discussion of the jurisdictional and police powers of postal service guards, see generally, *United States v. Gliatta*, 580 F.2d 156 (5th Cir. 1978).