KAREN LeCRAFT HENDERSON Circuit Judge,
dissenting:
At issue in this case is the proper interpretation of the following language of the Identity Theft Penalty Enhancement Act, Pub.L. 108-275, § 2(a), 118 Stat. 831 (IT-PEA):
Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.
18 U.S.C. § 1028A(a)(l) (emphasis added).[1] The majority interprets this language to require that the Government prove that the defendant knew “the ‘means of identification’ he ‘transferred], possesse[d], or use[d]’ actually belonged to ‘another person!.]’ ” Maj. Op. at 1236 (quoting 18 U.S.C. § 1028A(a)(l)) (alterations in majority opinion). Because I believe the majority misreads this language, I respectfully dissent.
I.
The facts are not in dispute. Appellee Villanueva-Sotelo is a Mexican national who has entered the United States illegally at least three times and twice been returned to Mexico.[2] On August 5, 2006, he was arrested and charged with, inter alia, aggravated identity theft under section 1028A(a)(l) after he presented a false Permanent Resident Card (Card)[3] to an offi *1251 cer of the Metropolitan Police Department (MPD) in the District of Columbia. See Indictment 2. Although the Card bore Villanueva-Sotelo’s name and photograph, it contained a registration number assigned to another person. Villanueva-So-telo admits knowing the Card was false; however, he contends that he did not know the registration number belonged to another person. For its part, the Government concedes that it cannot prove that Villanueva-Sotelo knew the number belonged to another person. See Gov’t Br. 5.
On May 11, 2006, the Government charged Villanueva-Sotelo with unlawful re-entry of a removed alien (8 U.S.C. § 1326(a) and (b)(1)) (Count 1), possession of false immigration documents (18 U.S.C. § 1546(a)) (Count 2) and aggravated identity theft (18 U.S.C. § 1028A(a)(l)) (Count 3). Villanueva-Sotelo pleaded guilty to the first two counts but challenged the aggravated identity theft count, arguing that under section 1028A(a)(l) the Government was required to establish that he knew the Card he presented contained the registration number “of another person.” The district court agreed and dismissed Count 3, the aggravated identity theft count.[4] The Government then appealed and today the majority affirms the dismissal of Count 3.
II.
At least two sister circuits have interpreted section 1028A(a)(l)’s language as unambiguously not requiring that the defendant know that the false “means of identification” belongs to another. United States v. Hurtado, 508 F.3d 603, 610 (11th Cir.2007); United States v. Montejo, 442 F.3d 213, 217 (4th Cir.), cert. denied, — U.S. —, 127 S.Ct. 366, 166 L.Ed.2d 138 (2006). A third circuit has followed the Fourth Circuit’s rationale without additional analysis. United States v. Hines, 472 F.3d 1038, 1039-40 (8th Cir.), cert. denied, — U.S. —, 128 S.Ct. 235, 169 L.Ed.2d 170 (2007). The majority’s interpretation therefore causes a disfavored circuit split. See United States v. Philip Morris USA Inc., 396 F.3d 1190, 1201 (D.C.Cir.) (“[W]e avoid creating circuit splits when possible .... ”), cert. denied, 546 U.S. 960, 126 S.Ct. 478, 163 L.Ed.2d 363 (2005).[5] Its disagreement with the *1252 other circuits is two-fold: it first finds the language ambiguous, see Maj. Op. at 1237-43; it then construes the ambiguity in the defendant’s favor. Maj. Op. at 1246-47. Even if the Fourth, Eighth and Eleventh Circuits incorrectly view the language as unambiguous,[6] I nonetheless agree with their reading of the language that the Government need not establish the defendant knew the false means of identification is that “of another person.”
Because the majority views the provision as ambiguous, it looks beyond the words to discern their meaning. It then concludes that “ ‘the statutory structure, relevant legislative history, [and] congressional purposes expressed in the [statute]’ ” all support applying the knowledge requirement to every element of section 1028A(a)(l). Maj. Op. at 1242-43 (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 737, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)) (alterations in majority opinion). It first places great emphasis on the word “theft” in the ITPEA’s title. Apparently the majority believes that Villanueva-So-telo’s conduct does not constitute aggravated identity theft because his “accidental misappropriation,” Maj. Op. at 1246, of another’s identification number — the “accident,” I assume, relating to his ignorance of the fact that the identification he knows to be false is assigned to another person— would not constitute “theft.” See Maj. Op. at 1243 (“As th[e] title demonstrates, the statute concerns ‘theft,’ i.e., ‘the felonious taking and removing of personal property with intent to deprive the rightful owner of it’ ” Webster’s Third New International DiCtionary 2369 (1993) (emphasis added); see also Blaoií’s Law Dictionary 1516 (8th ed. 2004) (‘The felonious taking and removing of another’s personal property with the intent of depriving the true owner of it.’). According to the majority, the fact that the title uses the word “theft” shows that the Congress intended “to single out thieves— in the traditional sense of the word.” Id. But determining the mens rea required to commit a federal offense does not necessarily entail finding a “common-law” match. Instead it involves the “ ‘construction of the statute and ... inference of the intent of Congress.’” Staples v. United *1253 States, 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (quoting United States v. Balint, 258 U.S. 250, 253, 42 S.Ct. 301, 66 L.Ed. 604 (1922)) (ellipsis in original); see also Liparota, 471 U.S. 419, 424, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) (“The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute.”) (citing United States v. Hudson, 11 U.S. (7 Crunch) 32, 3 L.Ed. 259 (1812)). Here the Congress has made clear — in discussing the same title the majority reads as limited to common-law theft — that identity “theft” is a much broader offense than the majority prefers. The House Judiciary Committee Report accompanying the ITPEA explains that “the terms ‘identity theft’ and ‘identity fraud’ refer to all types of crimes in which someone wrongfully obtains and uses another person’s personal data in some way that involves fraud or deception, typically for economic or other gain, including immigration benefits.” H.R.Rep. No. 108-528, at 4, 2004 U.S.C.C.A.N. at 780 (2004) (emphases added) (House Report); see also id. at 25 (statement of Rep. Coble) (“Identity theft and identity fraud are terms used to refer to all types of crimes in which an individual’s personal or financial data is misused, typically for economic gain or to facilitate another criminal activity.” (emphasis added)). The Congress’s synonymizing “identity theft” and “identity fraud” — followed by a definition that includes “all types” of crime “that involve[] fraud or deception” — could not make clearer that identity “theft” is meant to be read generically.[7]
The majority dismisses the House Report’s discussion of the breadth of “identity theft” by positing that the Congress did not consider “imagining] a string of random numbers” to be a “wrongful[ ]” way of possessing and/or using another person’s “means of identification.” See Maj. Op. at 1244 (emphasis added). To support this notion, the majority points to a section of the House Report that includes several examples of techniques commonly used in identity theft (e.g., “ ‘dumpster diving,’ ” “ ‘hacking] into computers,’ ” and “ ‘stealing] paperwork likely to contain personal information,’ ” id. (quoting H.R.Rep. No. 108-528, at 4-5, 2004 U.S.C.C.A.N. at 780-781)) and lists “a string of cases in which convicted identity thieves escaped with relatively light sentences, all of which involved defendants who, unlike Villanueva-Sotelo, knew the identification they used belonged to another.” Id. Finally, the majority highlights *1254 two statements from the floor debate to the same effect. Id. at 1244 (quoting 150 Cong. Rec. H4809 (daily ed. June 23, 2004) (statement of Rep Sensenbrenner) (noting that “identity thieves” “sometimes [steal] hundreds or even thousands of identities”); id. at H4810 (statement of Rep. Carter) (noting case wherein “Texas driver’s license bureau clerk pleaded guilty to selling ID cards to illegal immigrants using stolen information from immigration papers”)). To make the strongest argument for the enactment of the ITPEA, however, the drafters of the House Report understandably highlighted the most notorious cases in which defendants had received “light” punishment under the then-existing law. That a crime like Villanueva-So-telo’s — i.e., the knowing use of an false identification without also knowing the false identification belongs to another person — did not make the “worst case” list does not mean that Villanueva-Sotelo’s conduct is not covered by section 1028A(a)(l).[8]
Indeed, I read the House Report to expressly manifest that the Congress did consider Villanueva-Sotelo’s conduct covered. A primary purpose of the statute was to increase the punishment for a defendant who “wrongfully obtains and uses another person’s personal data,” H.R. Rep. No 108-528 at 4, 2004 U.S.C.C.A.N. at 780 (emphasis added), so that the punishment more closely fits the harm the crime causes its victim.[9] In concluding *1255 that the examples of “identity theft” included in the House Report exhaustively describe the types of “wrongful” behavior the Congress intended to sanction, the majority has lost sight of the Congress’s primary objective — stopping the nation-wide identity theft tidal wave by upping the ante for the thief. It is preposterous to think the same Congress that so plainly and firmly intended to increase the penalty — “a mandatory consecutive penalty enhancement of 2 years” — if the defendant possesses another’s means of identification “in order to commit a serious federal predicate offense,” id. at 10, 2004 U.S.C.C.A.N. at 785, would then so limit its imposition as to require the Government to prove that the defendant knows he wrongfully possesses the identity “of another person.” [10] In this respect, the majority ignores reality in “doubt[ing] that [its] interpretation of section 1028A(a)(l) will saddle the government with a burden it cannot meet.” Maj. Op. at 1249. Except for the forger himself, proving beyond a reasonable doubt that each of the thousands, if not millions, of holders of false green cards knows that the false means of identification he possesses is that “of another person” would “plaee[ ] on the prosecution [an] often impossible burden.” United States v. Chin, 981 F.2d 1275, 1280 (D.C.Cir.1992), cert. denied, 508 U.S. 923, 113 S.Ct. 2377, 124 L.Ed.2d 281 (1993). The legislative history persuades me that the Congress considered the unauthorized use of another person’s means of identification to be “wrongful” and therefore covered by section 1028A(a)(l) whether done by “dumpster diving,” “hacking into a computer system” or “imagining a string of numbers.”[11]
*1256 But resort to legislative history and congressional intent is not even necessary if the meaning of the language is discernible from a construction of the language under review together with language in pari materia. We have often held that if the Congress had intended language in legislation to have a certain disputed meaning, “it would have said so more clearly.” Bluewater Network v. E.P.A., 370 F.3d 1, 18 (D.C.Cir.2004); see also Gustafson v. Alloyd Co., 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); Consumer Fed’n of Am. v. U.S. Dep’t. of Health & Human Servs., 83 F.3d 1497, 1503 n. 6 (D.C.Cir.1996) (“[H]ad Congress [so] intended ..., it presumably would have drafted the statute differently....”). Here the Congress “could have drafted the statute to prohibit the knowing transfer, possession, or use, without lawful authority, of the means of identification ‘known to belong to another actual person.’ ” United States v. Hurtado, 508 F.3d 603, 609 (11th Cir.2007). This is precisely what the Congress did in 18 U.S.C. § 1546(a) — the predicate offense Villanueva-Sotelo pleaded guilty to in Count 2, triggering the enhanced penalty of section 1028A(a)(l). Section 1546(a) makes it illegal to:
utter[ ], use[ ], attempt[ ] to use, possess[], obtain[], accept[], or receive[] any [forged, counterfeited, altered or falsely made] ... document prescribed by statute or regulation ... as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of *1257 any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained.
18 U.S.C. § 1546(a) (emphasis added). By this language the Congress plainly intended that Villanueva-Sotelo know that the Card he presented to the MPD officer was forged, counterfeited, altered or falsely made. The fact that the Congress chose not to use the same language in section 1028A(a)(l) — a provision whose enhancement expressly incorporates 18 U.S.C. § 1546(a) (with its differing language) and which therefore must be given a construction in pari materia[12] — persuades me that it did not intend to require Villanueva-Sotelo to know that the Card he presented was that “of another person” in order to violate section 1028A(a)(l). If it had so intended, it would have phrased section 1028A(a)(l) as explicitly as it did section 1546(a); for example, “a means of identification known to belong to another person.” [13] The fact that Villanueva-Sotelo is, in my view, guilty of both Count 2 (which he admits) and Count 3 (of which he professes his innocence) based on the same mens rea does not mean the charges are duplicative. Villanueva-Sotelo can commit the predicate offense set out in section 1546(a) whether or not the false means of identification belongs to another; if it does belong to another, that is, if it fits the description set out in section 1028A(a)(l), Villanueva-Sotelo has also committed the “aggravated” offense and thereby added a mandatory two-years’ consecutive imprisonment to his punishment.
Moreover, a comparison of sections 1028A(a)(l) and 1028A(a)(2) also demonstrates that the Congress did not intend “knowingly” to modify “of another person.” Subsection (a)(2) provides for a five-year penalty enhancement for anyone who “during and in relation to” a terrorist act (per 18 U.S.C. § 2332b(g)(5)(B)):
knowingly transfers, possesses, or uses, without lawful authority, [1] a means of *1258 identification of another person or [2] a false identification document....
18 U.S.C. § 1028A(a)(2) (emphasis added). The second prong of this subsection demonstrates the Congress’s intent that a terrorist’s knowledge that he possesses a “false” identification document supplies all the culpability necessary to commit aggravated identity theft. Thus, when subsection (a)(1) uses the identical phrase in speaking of one who “knowingly ... possesses ..., without lawful authority, a means of identification of another person,” the scienter requirement is satisfied if the defendant knows that he possesses “a means of identification” “without lawful authority.” The phrase “of another person” is, in effect, jurisdictional language describing the “means of identification” that triggers an additional penalty.[14]
Both the majority and I spill a lot of ink on dueling canons of statutory construction. See supra pp. 1256-58; Maj. Op at 1237-40, 1247-49. Perhaps our exchange illustrates little more than that, in construing statutes, courts have a variety of interpretive aids to choose from. The first principle of statutory construction, however, is to apply common sense in the reading of language. See United States v. Howell, 11 Wall. 432, 78 U.S. 432, 436, 20 L.Ed. 195 (1870) (“[Ojne of the first canons of construction teaches us to avoid if possible [a result] which is at war with the common sense.... ”); Roschen v. Ward, 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929) (“[Tjhere is no canon against using common sense in construing laws as saying what they obviously mean.”); Nat’l Rifle Ass’n of Am., Inc. v. Reno, 216 F.3d 122, 127 (D.C.Cir.2000). Common sense tells me that the Congress, seeking to stop a type of crime that is increasing on an almost daily basis, enhanced the penalty to effect its purpose. And it is anything but common sense to conclude that the same Congress intended to gut that enhanced penalty, as the majority’s reading does.
Finally, I believe the majority misinterprets Supreme Court precedent. That precedent teaches that “[t]he presumption in favor of scienter requires a court to read into a statute only that mens rea which is necessary to separate wrongful conduct from ‘otherwise innocent conduct.’ ” Carter v. United States, 530 U.S. 255, 256-57, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 72, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994)) (first emphasis added). For example, in Liparota v. United States, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), the Supreme Court interpreted the mens rea requirement of a statute which prohibited “knowingly us[ing], transferfing], acquiring], altering], or possessing] [food] coupons,” 7 U.S.C. § 2024(b)(1), “in any manner not authorized by statute or regulations.” Liparota, 471 U.S. at 426, 105 S.Ct. 2084. At issue was whether the “knowledge” requirement applied to each element of the offense — i.e., whether the defendant was required to know that he was using food stamps “in a manner not authorized by statute or regulations.” Liparota, 471 U.S. at 426, 105 S.Ct. 2084. The Court *1259 found the language of the food stamp statute ambiguous and noted that the legislative history did not clarify the scope of the mens rea requirement. See id. at 424-25, 105 S.Ct. 2084. The Court ultimately held that the “knowledge” requirement applied to each element of the offense, emphasizing its desire to avoid “eriminaliz[ing] a broad range of apparently innocent conduct.” [15] Id. at 426, 105 S.Ct. 2084.
In United States v. X-Citement Video, Inc., 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), the Supreme Court expressed the same concern in interpreting a statute which criminalized “knowingly” transporting, shipping, receiving, distributing or reproducing sexually explicit material involving minors.[16] The Court believed that under the “most grammatical reading of the statute,” id. at 70, 115 S.Ct. 464, “knowingly” would modify only the immediately surrounding verbs (i.e., “transports or ships”). This construction, however, would allow conviction even if the defendant was not aware that the materials were sexually explicit or that the actors were minors. Id. at 68, 115 S.Ct. 464. The Court chose not to give the “most natural,” id., reading of the statute, instead extending the mens rea requirement to each element of the offense. It explained that “the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct.” Id. at 72, 115 S.Ct. 464 (discussing Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) and Staples v. United States, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)). Otherwise:
a retail druggist who returns an unin-spected roll of developed film to a customer “knowingly distributes” a visual depiction and would be criminally liable if it were later discovered that the visual depiction contained images of children engaged in sexually explicit conduct. Or, a new resident of an apartment might receive mail for the prior resident and store the mail unopened. If the prior tenant had requested delivery of [explicit] materials ... his residential successor could be prosecuted for “knowing receipt” of such materials. *1260 Similarly, a Federal Express courier who delivers a box in which the shipper has declared the contents to be “film” “knowingly transports” such film. We do not assume that Congress, in passing laws, intended such results.
Id. at 69-70, 115 S.Ct. 464. The Court characterized this result as “not merely odd, but positively absurd.” Id. at 69, 115 S.Ct. 464.[17]
There is no similar danger that innocent or unwitting conduct might be penalized under section 1028A(a)(l) because a conviction can be had only if the defendant has used another person’s means of identification during or in relation to one of the felony offenses enumerated in section 1028A(c).[18] Section 1028A(a)(l) functions as any “other federal law[] which provided] enhanced penalties or allow[s] conviction for obviously antisocial conduct upon proof of a fact of which defendant need not be aware.’ ” United States v. Montejo, 442 F.3d 213, 216-17 (4th Cir.2006) (quoting United States v. Cook, 76 F.3d 596, 601 (4th Cir.1996)); see, e.g., United States v. Feola, 420 U.S. 671, 684, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) (upholding penalty enhancement under 18 U.S.C. § 111 for any person who assaults federal officer whether or not he knows victim is, in fact, federal officer);[19] see also United States v. LaPorta, 46 F.3d 152, 158 (2d Cir.1994) (defendant not required to know torched building was gov- *1261 eminent property because “[a]rson is hardly otherwise innocent conduct” (quotation omitted)); United States v. Falu, 776 F.2d 46, 50 (2d Cir.1985) (Drug Free School Zone Act: “This construction ... does not criminalize otherwise innocent activity”); United States v. Hamilton, 456 F.2d 171, 172-73 (3d Cir.) (in Mann Act prosecution, defendant not required to know minor transported across state line for immoral purpose was under eighteen; “knowingly” held to refer only to act of transportation), cert. denied, 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972). In these cases — where the defendant can “hardly be surprised to learn that [his behavior] is not an innocent act,” see United States v. Freed, 401 U.S. 601, 609, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) — the courts have made it the defendant’s duty to “ ‘ascertain^] at his peril whether [his actions] come[ ] within the inhibition of the statute.’ ” Id. (quoting United States v. Balint, 258 U.S. 250, 253-54, 42 S.Ct. 301, 66 L.Ed. 604 (1922)). It is well settled that we must “presum[e] that Congress was aware of [the Court’s] ... judicial interpretations,” Keene Corp. v. United States, 508 U.S. 200, 212, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993), including “[t]he presumption in favor of scienter [that] generally requires a court to read into a statute only that mens rea which is necessary to separate wrongful conduct from ‘otherwise innocent conduct.’ ” Carter, 530 U.S. at 257, 120 S.Ct. 2159 (quoting X-Citement Video, 513 U.S. at 72, 115 S.Ct. 464) (first emphasis added). Applying the presumption here, I cannot help but conclude that the Congress intended the violation of section 1028A(a)(l) to hinge on the defendant’s knowing use of a means of identification known to be false without his also having to know the false identification is that “of another person.”
In sum, I would hold, as has every other circuit that has construed this language, see United States v. Montejo, 442 F.3d 213 (4th Cir.), cert. denied, — U.S. —, 127 S.Ct. 366, 166 L.Ed.2d 138 (2006); United States v. Hines, 472 F.3d 1038 (8th Cir.), cert. denied, — U.S. —, 128 S.Ct. 235, 169 L.Ed.2d 170 (2007); United States v. Hurtado, 508 F.3d 603 (11th Cir.2007), that section 1028A(a)(1) of the ITPEA does not require the Government to prove that the defendant know that the false “means of identification” he possesses is that “of another person.” 18 U.S.C. § 1028A(a)(l).[20] Accordingly, I would reverse the district court’s dismissal of Count 3, charging Villanueva-Sotelo with a violation of 18 U.S.C. § 1028A(a)(l).

. Among the felony violations enumerated in subsection (c) is any violation of "chapter 75 (relating to passports and visas).” 18 U.S.C. § 1028A(c)(7). Villanueva-Sotelo pleaded guilty to violating subsection (7). See infra pp. 1256-57.

. On June 15, 1990, Villanueva-Sotelo was arrested in Oroville, Washington for shoplifting. He pleaded guilty to misdemeanor theft and was sentenced to 10 days in jail. On July 3, 1990, a United States immigration judge ordered Villanueva-Sotelo's removal from the United States and he was deported to Mexico. See Factual Proffer in Support of Guilty Plea 2. Villanueva-Sotelo re-entered the United States and was again arrested in Washington State. He pleaded guilty to unauthorized reentry of a removed alien (8 U.S.C. § 1326), possession of false immigration documents (18 U.S.C. § 1546(a)) and possession of five or more false identification documents with intent to transfer (18 U.S.C. § 1028(a)(3)); he was sentenced to two months’ incarceration. On September 23, 1991 he was again ordered deported to Mexico. See id.

.Until 2003 the Card, commonly known as a "green card,” was issued by the Immigration and Naturalization Service (INS) of the U.S. *1251 Department of Justice. Since 2003, when many INS functions were transferred to the newly-created Department of Homeland Security, the U.S. Citizenship and Immigration Service (USCIS) began issuing them. See 6 U.S.C. § 271(b); 8 U.S.C. § 1103. The Card includes, inter alia, the alien's name, photograph, date of birth, country of origin, expiration date, fingerprint and an alien registration number assigned to him by the USCIS. See, e.g., 8 U.S.C. §§ 1201, 1202(a)-(b), 1304(d) (requirements for immigrant visas); 8 C.F.R. § 264.5 ("Application for creation of record of permanent residence”).

. The district court thereby disagreed with the earlier decision of another district judge that section 1028A(a)(l) does not require the Government to prove that "the identification numbers on the fraudulent documents belonged to an actual person.” United States v. Contreras-Macedas, 437 F.Supp.2d 69, 76 (D.D.C.2006).

. At the district court level there is also disagreement. The District of Maine first concluded that section 1028A(a)(l)'s mens rea requirement applies to "of another person” (by submitting to the jury the question whether the defendant knew her false means of identification belonged to someone else), United States v. Godin, 476 F.Supp.2d 1, 3 (D.Me.2007); it then reversed field and adopted the Fourth Circuit's rationale. United States v. Godin, 489 F.Supp.2d 118, 119 (D.Me.2007). Other district courts have reached different conclusions. Compare United States v. Beachem, 399 F.Supp.2d 1156, 1158 (W.D.Wa.2005) (§ 1028A(a)(l)’s knowledge requirement applies to each element), and United States v. Salazar-Montero, No. CR 07-2020, 2007 WL 3102096, at * 13 *1252 (N.D.Iowa Oct.25, 2007) (same), with United States v. Montejo, 353 F.Supp.2d 643, 654 (E.D.Va.2005) (§ 1028A(a)(l)'s knowledge requirement does not modify “of another person”), and United States v. Contreras-Macedas, 437 F.Supp.2d 69, 79 (D.D.C.2006) (same).

. The decisions of the Supreme Court as well as of our Circuit have held that similarly worded criminal statutes — i.e., statutes containing the word "knowingly” followed by a verb or series of verbs, a direct object and at least one prepositional phrase describing that object — are ambiguous. See Liparota v. United States, 471 U.S. 419, 424, 425 n. 7, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) ("Either interpretation would accord with ordinary usage. 'As a matter of grammar the statute is ambiguous; it is not at all clear how far down the sentence the word ‘knowingly’ is intended to travel ....'" (quoting W. LaFave & A. Scott, Criminal Law § 27 (1972)); United States v. Chin, 981 F.2d 1275, 1279 (D.C.Cir.1992) (finding similarly structured criminal statute ambiguous: "One cannot tell from the words alone whether the person’s juvenile status must be known .... ”), cert. denied, 508 U.S. 923, 113 S.Ct. 2377, 124 L.Ed.2d 281 (1993); United States v. Mofziger, 878 F.2d 442, 447(D.C.Cir.l989) (finding similarly structured criminal statute " ‘is ambiguous. The statute can be read either way.' ” (quoting United States v. O’Brien, 686 F.2d 850, 852 (10th Cir.1982)); cf. Arthur Andersen LLP v. United States, 544 U.S. 696, 705, 125 S.Ct. 2129, 161 L.Ed.2d 1008 (2005) ("We have recognized with regard to similar statutory language that the mens rea at least applies to the acts that immediately follow, if not to other elements down the statutory chain.”); see also McCreary v. Offner, 172 F.3d 76, 82-83 (D.C.Cir.1999) (noting other circuits’ differing interpretations of statute manifest statute is ambiguous).

. Even assuming arguendo that we were required to harmonize aggravated identity theft with common-law theft, could not the majority's view be inconsistent with the common law? See Maj. Op. at 1243 (defining “theft” as " 'the felonious taking and removing of personal property with intent to deprive the rightful owner of it’ ”) (emphasis added) (internal quotations omitted). In the majority’s view, a defendant could be guilty of aggravated identity theft despite not having "take[en]” or “remov[ed]” another's "personal property” so long as he knows the false identification belongs to another. Nor does the identity thief “deprive” the owner of the latter’s means of identification — -if anything, he "shares” the owner’s identity.
Moreover, depending on the context, "theft” often has a broader meaning than the common-law definition. See, e.g., Montejo, 353 F.Supp.2d at 654 (“While ‘theft’ is a popular term often identified with 'larceny,' the word 'theft' [can also be] an umbrella term which includes other forms of wrongful taking.” (quoting McLaughlin v. City of Canton, Miss., 947 F.Supp. 954, 970 n. 18 (S.D.Miss.1995))); Webster's Third New World Dictionary 2369 (including, in addition to the common-law definition of “theft”— which the majority cites — , "taking of property unlawfully”); Black’s Law Dictionary 1486 (7th ed. 1999) (noting that theft, in addition to its common-law definition, can also mean “[b]roadly, any act or instance of stealing.”).

. Indeed, the House Report fails to mention other common forms of identity theft, e.g., a parent misappropriating a child’s identity, see e.g., John Leland, Identity Thief Is Often Found in Family Photo, N.Y. Times, Nov. 13, 2006, at A 1 (describing parent-child identity fraud as commonplace).

. See 150 Cong. Rec. H4811 (statement of Rep. Schiff) ("A victim of identity theft usually spends a year and a half working to restore his or her identity and good name.... The current sentencing structure and practice is flawed because it does not reflect the impact on the victim, in addition to the impact and loss to the financial institution.”). The Congress’s central concern with the damage caused by the wrongful use of another person’s identity rings throughout the legislative history. See, e.g., H.R. Rep. No. 108-528, at 4, 2004 U.S.C.C.A.N. at 780 (''[T]he loss to businesses and financial institutions from identity theft [is estimated] to be $47.6 billion. The costs to individual consumers are estimated to be approximately $5.0 billion.”); id. at 25 (statement of Rep. Coble) (“In 2002, the FTC received 161,819 victim complaints of compromised personal information.... [These] victims have a difficult time consuming [sic] an expensive task of repairing a damaged credit history as well as their respective reputations.”); id. at 35 (statement of Rep. Scott) ("[T]he FTC reports [consumer identity theft] bilked almost 30 million Americans out of approximately $50 billion over the last 5 years, with about $5 billion of that out-of-pocket, unrecovered losses to consumers.”); id. at 44 ("Identity theft victims now spend an average of 600 hours — often over a period of years — recovering from the crime. Being a victim costs an average of $1,400 in out-of-pocket expenses ....”); id. at 51 (statement of Rep. Schiff) (noting that purpose of ITPEA is “to protect the good credit and reputation of hard-working Americans”).
The Congress also enacted the ITPEA in order to increase the penalty for a terrorist who possesses a false means of identification. See 18 U.S.C. § 1028A(a)(2) (mandating five-year consecutive prison term for "knowingly transfer[ing], possessing] or us[ing], without lawful authority, a means of identification of another person or a false identification document” “during and in relation to any felony violation enumerated in section 2332b(g)(5)(B)” (i.e., a terrorism offense)); H.R. Rep. No 108-528, at 3, 2004 U.S.C.C.A.N. at 779 (“The bill also amends current law to impose a higher maximum penalty for identity theft used to facilitate acts of terrorism.”); id. at 4, 2004 U.S.C.C.A.N. at 780 ("[A]l Qaida and other terrorist organizations increasingly turn to stolen identities to hide themselves from law enforcement.”). Significantly, the five-year consecutive sentence is to be imposed whether or not the false identification is that “of another person,” manifesting that scienter “of another person” is not required.

. Must the government also prove the defendant knows "another person[’s]” identity? I assume even the majority would not offer that reading.

. I note just one example of a result that can fit within the majority’s seemingly benign "accidental misappropriation” label, Maj. Op. at 1246:
One woman’s Social Security identification number has been used by at least 81 people in 17 states.... [IJnformation gleaned from criminal investigations, tax documents and other sources suggest most of the users were probably illegal immigrants trying to get work.
Audra Schmierer, a 33-year-old housewife in this affluent San Francisco suburb, realized she had a problem in February 2005, when she got a statement from the IRS saying she owed $15,813 in back taxes — even though she had not worked since her son was born in 2000. Perhaps even more surprising, the taxes were due from jobs in Texas.
Schmierer has since found that her Social Security number has been used by people from Florida to Washington state, at construction sites, fast-food restaurants and even major high-tech companies. Some opened bank accounts using the number.
Under current law, if the Social Security Administration or the Internal Revenue Service find multiple people using the same Social Security number, the agencies send letters informing employers of possible errors.
The IRS can fine employers $50 for each inaccurate number filed, a punishment that companies often dismiss as just another cost of doing business.
"Sending letters is the limit to what can be done,” Social Security spokesman Lowell Kepke said. "We expect that will be able to fix any records that are incorrect.”
The information on mismatched names is seldom shared with law enforcement agencies.
Schmierer has done a little investigating of her own, combing through tax bills sent to her for names and locations of employers who hired people using her number.
She has also obtained more than 200 W-2 and 1099 tax forms that contained her *1256 Social Security number but different names.
Schmierer filed a police report after learning one man had used her information in 2003 at janitorial and landscaping companies near Haltom City, Texas.
Investigators found the man, who told officers he had bought a fake Social Security card at a flea market, according to a police report. He was not arrested.
What started as a hassle turned into a major headache earlier this year when she sought work through a temporary agency that learned her Social Security number had been used by a woman in Texas two years earlier. The agency could not hire Schmierer for more than a month while the situation was clarified.
"How do you prove that you are you?” Schmierer said. “It’s like you are guilty until proven innocent.”
While returning from a trip to Mexico with her husband last year, Schmierer was detained for four hours in a Dallas airport by immigration officials. The reason: a woman using her Social Security number was wanted for a felony.
Schmierer's number became so compromised that Social Security officials finally took a rare step used only in extreme cases: They gave her a new one.
Peter Prengaman, One Social Security Number, 81 People, CBS NEWS, June 17, 2006, available at http://www.cbsnews.com/ stories/2006/06/ 17/national/main 1726397. shtml?source=RS S & attr=HOME 1726397.
Whether the people who had these cards had obtained Schmeier's social security number through "dumpster diving,” "hacking into a computer system” or simply "imagining a string of numbers,” the harm Schmierer suffers is the same. Can the Congress really have intended to prevent the repetition of nightmares like Schmierer’s by punishing more severely only that thief (from among the 81) who knows that the purloined social security number is a real one?
The majority points out the obvious fact that this news report postdates by some two years the enactment of the ITPEA. Maj. Op. at 1249. I highlight it, of course, not as legislative history but as an example of what the majority’s oxymoronic "accidental misappropriation” interpretation will work.

. "Statutory provisions in pari materia normally are construed together to discern their meaning.” Motion Picture Ass'n of Am., Inc. v. FCC, 309 F.3d 796, 801 (D.C.Cir.2002) (citing Erlenbaugh v. United States, 409 U.S. 239, 244, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972)).
To be in pari materia, statutes need not have been enacted simultaneously or refer to one another.... However, the rule that statutes in pari materia should be construed together has the greatest probative force ... or in the case where the later of two or more statutes relating to the same subject matter refers to the earlier. In these situations the probability that acts relating to the same subject matter were based on the same policy is very high.
2B Sutherland Statutory Construction § 51:3 (6th ed. 2000) (emphases added) (footnotes omitted); see, e.g., Estate of Headrick v. Comm’n, 918 F.2d 1263, 1266 (6th Cir.1990) (tax statutes " 'specifically cross referencing]' " each other construed in pari mate-ria) (quoting Estate of Leder v. Comm’n, 893 F.2d 237, 241 (10th Cir.1989)); United States v. Rodriguez, 60 F.3d 193, 196 (5th Cir.1995) ("explicit cross reference” supported construing U.S.S.G. § 5C1.2 and Fed.R.Crim.P. 32(c) in pari materia); Mimkon v. Ford, 66 N.J. 426, 332 A.2d 199, 203 (1975) ("[T]he rule most obviously applies .... where [the statutes in question] make specific reference to one another ....”) (citing 2A Sutherland Statutory Construction § 51.03 (Sands ed. 1973)); Keith v. Lockhart, 171 N.C. 451, 88 S.E. 640, 642 (1916) (construing two statutes in pari mate-ria when "the later statute ... in express terms refers to ... the former). Because Section 1028A(c)(7) expressly incorporates by reference section 1546(a) and because both sections, as well as section 1028A(a)(l), relate to the same subject matter (possession of a false means of identification), they are to be construed in pari materia.

. See, e.g., 18 U.S.C. § 922(q)(2)(A) ("It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.’’) (emphases added).

. Construing 1028A(a)(l) and 1028A(a)(2) together also reveals that the majority’s emphasis on the word “theft” in the ITPEA’s title is misplaced. Under the second prong of section 1028A(a)(2) a defendant can be convicted of aggravated identity theft despite the fact that he has not misappropriated — acci-dently or otherwise — another person’s identity. That the knowing possession of "a false identification document” suffices to violate section 1028A(a)(2) makes clear that the Congress intended identity “theft” to be construed broadly — in some instances not even requiring the "traditional” theft the majority describes.

. The Court explained:
[The statute] declares it criminal to use, transfer, acquire, alter, or possess food stamps in any manner not authorized by statute or regulations. The statute provides further that "[c]oupons issued to eligible households shall be used by them only to purchase food in retail food stores which have been approved for participation in the food stamp program at prices prevailing in such stores.” 7 U.S.C. § 2016(b) ... This seems to be the only authorized use. A strict reading of the statute with no knowledge-of-illegality requirement would thus render criminal a food stamp recipient who, for example, used stamps to purchase food from a store that, unknown to him, charged higher than normal prices to food stamp program participants. Such a reading would also render criminal a nonreci-pient of food stamps who "possessed” stamps because he was mistakenly sent them through the mail due to administrative error, "altered” them by tearing them up, and "transferred” them by throwing them away. Of course, Congress could have intended that this broad range of conduct be made illegal, perhaps with the understanding that prosecutors would exercise their discretion to avoid such harsh results. However, given the paucity of material suggesting that Congress did so intend, we are reluctant to adopt such a sweeping interpretation.
Liparota, 471 U.S. at 426-27, 105 S.Ct. 2084 (emphases and alterations in original) (citations and footnote omitted).

. The statute allowed criminal charges to be brought against any person who "knowingly transports or ships in interstate or foreign commerce ... any visual depiction, if ... the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct.” 18 U.S.C. § 2252(a).

.Until today, our decisions have been to the same effect. For example, in United States v. Chin, 981 F.2d 1275 (D.C.Cir.1992), cert. denied, 508 U.S. 923, 113 S.Ct. 2377, 124 L.Ed.2d 281 (1993), we held that under 21 U.S.C. § 861(a)(2) — which prohibits anyone who illegally distributes a controlled substance from "knowingly and intentionally ... employing] ... a person under eighteen years of age to assist” — the Government need not prove the defendant knew his accomplice was under eighteen. We noted that "this is not an instance in which a broad interpretation of a statute threatens to criminalize 'apparently innocent conduct.’ ” Id. at 1280 (quoting Liparota, 471 U.S. at 426, 105 S.Ct. 2084). We explained that “[a] conviction under 21 U.S.C. § 861(a)(2) can be had only upon proof that the person knowingly and intentionally” used another person to distribute controlled substances. Id. Because the distribution of narcotics is hardly an innocent act, we held that the Government was not required to prove that the defendant knew his accomplice was under eighteen. Cf. United States v. Williams, 922 F.2d 737, 738-39 (11th Cir.) (interpreting same subsection and concluding Government need not prove defendant knew minor’s age), cert. denied, 502 U.S. 892, 112 S.Ct. 258, 116 L.Ed.2d 212 (1991); United States v. Valencia-Roldan, 893 F.2d 1080, 1083 (9th Cir.) (same), cert. denied, 495 U.S. 935, 110 S.Ct 2181, 109 L.Ed.2d 509 (1990); United States v. Carter, 854 F.2d 1102, 1108-09 (8th Cir.1988) (same). In United States v. Holland, 810 F.2d 1215, 1223-24 (D.C.Cir.), cert. denied, 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 854 (1987); we held that under 21 U.S.C. § 845a (recodified as 21 U.S.C. § 860) — which prohibited the sale of controlled substances within 1000 feet of a elementary or secondary school — the Government need not prove that the defendant knew that a school was within 1000 feet because such reading was not necessary to avoid "criminaliz[ing] a broad range of apparently innocent conduct.’ ” Id. at 1223.

. As noted earlier, Villanueva-Sotelo admitted knowing the Card he possessed was false and that his possession of the Card was illegal, see Factual Proffer 3, unlike the Liparota defendant who professed his ignorance of any unlawful conduct.

. The Feola Court reasoned that:
[its] interpretation [of § 111] poses no risk of unfairness to defendants. It is no snare for the unsuspecting. Although the perpetrator ... may be surprised to find that his intended victim is a federal officer in civilian apparel, he nonetheless knows from the very outset that his planned course of conduct is wrongful. The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual [victim].... [T]he offender takes his victim as he finds him.
Feola, 420 U.S. at 685, 95 S.Ct. 1255.

. I believe the rule of lenity is inapplicable here, even if only as an alternative holding. See Maj. Op. at 1246-47. See Chapman v. United States, 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (rule of lenily "is not applicable unless there is a 'grievous ambiguity or uncertainty in the language and structure of the Act,’ ... such that even after a court has seize[d] everything from which aid can be derived,’ it is still ‘left with an ambiguous statute.' ”) (quoting Huddleston v. United States, 415 U.S. 814, 831, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974); United States v. Bass, 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)). To the extent the relevant language is ambiguous, it is far from “grievously” so; legislative history and statutory language in pari mateña clear it up nicely.